**UNITED STATES of America,**
Plaintiff–Appellee,

v.

**Matthew Otis CHARLES,**
Defendant–Appellant.

No. 96–6718.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 30, 1998.

Decided March 5, 1998.

Sunny A. Koshy (argued and briefed), Office of the U.S. Atty., Nashville, TN, for Plaintiff–Appellee.

William Henry Haile (argued and briefed), Nashville, TN, for Defendant–Appellant.

Before: NELSON, SUHRHEINRICH, and GILMAN, Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

In this criminal case, the defendant Matthew Otis Charles appeals from a jury verdict convicting him of the following offenses: conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846 (Count 1); making false statements to firearms dealers in violation of 18 U.S.C. § 922(a)(6) (Counts 2 & 3); possession of cocaine base with intent to distribute and distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1) on November 22, 1995 and December 15, 1995 respectively (Count 4 & 7); and being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) on November 22, 1995 and December 15, 1995 respectively (Count 5 & 8). The jury acquitted Charles of using a firearm during the commission of a drug trafficking crime (Count 6).

In his appeal, Charles challenges numerous aspects of his trial and sentence. First, he argues that errors in the return of the search warrant prejudiced him at trial. Charles also claims that the affidavit supporting the search warrant contained deliberately or recklessly false statements, and thus all of the evidence seized as a result of this warrant should have been suppressed. In addition, he contends that the evidence presented at trial was insufficient to convict him of possession of crack cocaine on December 15, 1995. Finally, Charles challenges the district court's application of the sentencing guidelines. More specifically, Charles claims that the district court wrongly imposed a

two-level enhancement for obstruction of justice. He also argues that the district court applied the wrong base offense level because the base amount of drugs was overestimated.

For the reasons stated below, we find that Charles's claims lack merit or, in the alternative, that any errors were harmless. Accordingly, we uphold the jury's verdict and affirm the rulings of the district court.

## I. FACTUAL BACKGROUND

Sometime prior to November 15, 1995, Charles moved from North Carolina to Clarksville, Tennessee. Clarksville is near Fort Campbell, where he had previously served in the Army. In North Carolina, Charles had been convicted of several breaking and entering crimes, two kidnapings, and aggravated assault for shooting a victim with a sawed off shotgun while attempting to escape. In Clarksville, Charles assumed the name "Charles Owen." He used the name and birth certificate of the real Charles Owen, a man he knew in North Carolina, to obtain a Tennessee driver's license. Charles lived at 862 Parham Drive until his roommate got married, at which time he moved to a nearby trailer park. Because Charles raised registered Rottweilers, and the trailer park did not permit dogs, Charles returned daily to 862 Parham to care for the dogs. He also occasionally spent the night at the home. The utilities for the home continued to be registered under his assumed name.

On November 15, 1995, Army Criminal Investigation Command ("CID") agents arrested Private DeJuan Bell, a soldier stationed at Ft. Campbell. The arrest occurred after Bell participated in several drug transactions with undercover Investigator Brodie Slade. Bell agreed to cooperate with the CID by assisting them in apprehending a bulk cocaine dealer known to Bell only as "O." Bell arranged a meeting between Slade, "O," and himself for November 22, 1995. Bell and Slade planned to purchase one ounce of "crack" in exchange for $1,200. "O" instructed them to meet him at 862 Parham Drive to complete the transaction.

At noon on November 22, 1995, Bell and Slade arrived at 862 Parham Drive and proceeded with the transaction by giving "O" $1,200 in cash in exchange for what they thought at the time was one ounce of cocaine base. Both Slade and Bell identified "O" as the defendant, Matthew Otis Charles. The crack was later determined to be only 20 grams rather than the one ounce (28.35 grams) for which Bell and Slade had negotiated. Slade noted that the 20 grams they received amounted to about half of the crack "O" had shown him. During the drug transaction at 862 Parham Drive, Slade and Bell also noticed three firearms—a shotgun, a rifle, and a pistol—on the premises.

As Slade was leaving the house, he observed a distinctively customized blue Buick station wagon and a white BMW parked in front of the house. Slade later traced the license plates and found that they were registered to Charles Owen. Bell had previously informed the CID that his supplier drove a customized blue Buick station wagon.

Between November 22, 1995 and December 15, 1995, Slade attempted to organize several other drug transactions with Charles. These attempts were unsuccessful because Slade was concerned for his safety. Slade claims that during one of the unsuccessful attempts to organize a drug transaction, Charles admitted to possessing cocaine.

Finally, on December 15, 1995, Slade and Charles arranged to meet at Extreme Audio, a nearby store, to negotiate a drug transaction. At the meeting, Slade gave Charles $1,200 as a down payment on two ounces of crack cocaine. Charles then told Slade that he planned on driving to Nashville to obtain the drugs and would meet Slade later that same day at 862 Parham Drive. After receiving $1,200, the CID surveillance team witnessed Charles drive off in a Cadillac, fill the car with gasoline, and return to Extreme Audio to pick up two male passengers. Charles then drove toward the highway, but the CID surveillance team lost contact with Charles's car.

Charles returned that afternoon to 862 Parham, at which time the Clarksville Police Department officers detained him. Charles initially consented to the search of 862 Parham, but later withdrew his consent. The government did not locate any drugs or mon-

ey. Prior to Charles's withdrawal of consent, however, officers saw the firearms that Slade and Bell had described after their transaction with Charles on November 22, 1995.

Apparently Bell called Charles while the officers were still searching the house. Speaking to Bell, Charles commented that he believed that Slade was an undercover agent. Bell also claims that Charles mentioned to Bell that while returning from Nashville, Charles recognized a red Corvette often used by the police as a surveillance vehicle. In an attempt to maintain his undercover identity, Slade also called Charles later that day to inquire about the drugs and the money. During the calls with Bell and Slade respectively, Charles mentioned that he had obtained the drugs and encouraged Slade to come to 862 Parham and retrieve them. Slade claims that he did not meet Charles because of safety concerns.

One week later, on December 21, 1995, Slade completed a lengthy affidavit which supplied the probable cause to obtain a search warrant for 862 Parham and an arrest warrant for "Charles Owen." The police executed the warrant on December 22, 1995. On that day, the police witnessed Charles, who was still using the alias of Charles Owen, leave 862 Parham in a white Buick. According to the government, Charles spotted Slade, who was on the surveillance team. About 100 meters from 862 Parham, the marshals arrested Charles in the white Buick. The marshals searched Charles, the white Buick, the blue Buick station wagon parked outside of 862 Parham, and the home at 862 Parham. The marshals seized an alpha-numeric pager from the white Buick. The pager displayed a message saying that Charles was under surveillance. The marshals also seized a cellular phone from the station wagon. The marshals then confiscated bank transactions records, telephone calling cards, and a driver's license from Charles's person. In addition, the marshals searched 862 Parham and seized firearms, ammunition, photographs, currency, and various other items from the house. The marshal in charge then completed the return of the warrant authorizing the search of 862 Parham. The return mistakenly listed all of the items seized as coming from the house, including items taken from Charles's person and his cars.

During his initial appearance before the magistrate judge, Charles identified himself as Charles Owen. The government moved to detain Charles. Despite this motion, the magistrate relied on the bail report, prepared by the Pretrial Services Officer, that outlined the relatively minor criminal record of the real Charles Owen. Relying on this information, the magistrate judge conditionally released Charles. Still assuming the identity of Charles Owen, Charles then signed the agreement outlining the conditions of his release and providing for unsecured bond. At some later point in time, the Clarksville police learned of Charles's true identity. On January 25, 1996, the police arrested Charles on state grounds, at which time he was transferred into federal custody.

Prior to trial, Charles filed several suppression motions alleging that Slade's affidavit supporting the search warrant was deliberately false. In support of his request for an evidentiary hearing on the veracity of Slade's affidavit, Charles filed an affidavit stating that he did not sell drugs to Slade on November 22, 1995. Charles's affidavit further stated that Slade had never been inside 862 Parham while Charles was there.

On June 28 and July 1, 1996, the judge held an evidentiary hearing on Charles's motions. Charles repeated the claims he made in his affidavit. In addition, Charles claimed that on the morning of November 22, 1995, he and some friends traveled in the blue Buick station wagon from Clarksville to Greenville, Mississippi. Contrary to Charles's testimony, Slade testified that he saw the station wagon parked in front of 862 Parham when he left the drug transaction on the morning of November 22, 1995. Evidence was also introduced that around noon on November 22, 1995, Charles opened a bank account in Clarksville with a $1,000 cash deposit. On September 17, 1996, the district court denied Charles's motions to suppress.

At trial, the jury convicted Charles of all of the charges except one. The presentence report recommended that Charles be held

responsible for possessing and selling 215 grams of crack cocaine. The court adopted the recommendation and placed Charles at a base offense level of 34, the applicable level under U.S.S.G. § 2D1.1 for 150–500 grams of crack cocaine. The district court then applied a two-level firearms enhancement under U.S.S.G. § 2D1.1(b)(1) for the guns displayed during the November 22, 1995 transaction. The court also applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 for Charles's false statements to the magistrate judge and committing perjury during the suppression hearing. With these enhancements, Charles's adjusted offense level was 38 and his Criminal History Category was VI. The combination of these factors yielded a guideline range of 360 months to life imprisonment. Ultimately, the court sentenced Charles to 420 months imprisonment and five years of supervised release for counts 1, 4, and 7; 180 months imprisonment for counts 5 and 8; and 120 months for counts 2 and 3. The district court judge ordered all sentences to run concurrently, imposed $1,030 in fines, and a $350 special assessment. This appeal followed.

## II. STANDARD OF REVIEW

This court reviews specific findings of fact made by the trial court under a "clearly erroneous" standard. *Hernandez v. New York,* 500 U.S. 352, 365–66, 111 S.Ct. 1859; 1869–70, 114 L.Ed.2d 395 (1991). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The district court's legal conclusions, however, are reviewed *de novo. United States v. Baro,* 15 F.3d 563, 566 (6th Cir.1994).

## III. ANALYSIS

### A. The Return of the Search Warrant

On the return of the search warrant for 862 Parham, the police listed three cellular phones, a pager, two Bell South phone cards, four bank transaction receipts, a driver's license, firearms, ammunition, and several other less significant items. The police admit that they seized some of the evidence from Charles's person and his cars rather than from 862 Parham. The police seized the phone cards, bank transaction receipts, and the driver's license from Charles's wallet during "booking and inventory procedures." The pager was located in the white Buick that Charles was driving when he was arrested. The police also seized one of the cellular phones from the blue Buick station wagon parked in front of 862 Parham. The police did not have a warrant for either of the cars. While collecting the items, the police took notes detailing the location of each item.

Both the Supreme Court and the Sixth Circuit have held that absent a showing of prejudice, an error on the return of a warrant will not nullify the evidence gathered as a result of an otherwise valid warrant. *Cady v. Dombrowski,* 413 U.S. 433, 449, 93 S.Ct. 2523, 2532, 37 L.Ed.2d 706 (1973) ("As these items were constitutionally seized, we do not deem it constitutionally significant that they were not listed in the return of the warrant."); *United States v. Moore,* 452 F.2d 569, 573 (6th Cir.1971) (holding that the defendant failed to show prejudice from the warrant return's omission of a seized item).

Charles claims that the marshals seized "a black address book, a blue shaving bag with dog registration and vaccination records, a cell phone, case and batteries, and the title to a 1984 Buick" from the station wagon parked in front of 862 Parham. Charles further asserts that the marshals had neither probable cause nor a warrant to search the station wagon, thus making the search unconstitutional. As a result of the faulty return, Charles claims that he is unable to distinguish between which items were seized lawfully and which were seized unlawfully. Consequently, he contends that the court must suppress all of the evidence seized that day.

The government contends that Charles was not prejudiced by the errors in the return of the search warrant. It argues that because the return listed all of the items seized, Charles was not surprised by any evidence introduced against him. The gov-

ernment also observes that Charles had the benefit of the officer's notes taken during the search. Moreover, the government argues that Charles had an opportunity to thoroughly question the police about the search and the original location of each seized item. Finally, the government claims that they seized only a cellular phone from the station wagon, and that the phone was not introduced into evidence at trial. In light of these assertions, the government argues that Charles was not prejudiced by the faulty return.

The district court found that the marshal's notes were particularly reliable because they were written contemporaneously with the search. These notes confirm and bolster the marshal's testimony that the cellular phone was the only item found in the station wagon. According to the marshal's notes, the rest of the items were seized from the front bedroom of the house. Furthermore, the district court found that Charles suffered no prejudice from the seizure of the phone because the government refrained from using the cellular phone at trial.

We conclude that the record supports the district court's findings about the location of the seized items. There is thus no basis to hold that the district court's ruling in this regard was clearly erroneous. While Charles might have been prejudiced if the return had been underinclusive, the opposite was true in this case. Charles had an opportunity to question the officers about the search and benefitted from access to the police officer's notes. Moreover, the record supports the district court's findings that the items seized were either seized as a result of a lawful search or were not introduced at trial. Thus, as a matter of law, the failure to accurately complete the return did not require the suppression of all the seized evidence.

### B. Slade's Affidavit

■ Charles claims that Slade's affidavit supporting the search warrant for 862 Parham and the arrest warrant for "Charles Owen" contained deliberately false and misleading statements. Without these alleged misrepresentations, Charles argues that the affidavit would not have provided the proba-

ble cause required to support the search and arrest warrants. He thus argues that the district court should have suppressed the evidence obtained as a result of the search and arrest. Charles has the burden of proving by a preponderance of the evidence that Slade's affidavit contained deliberate falsehoods or displayed a reckless disregard for the truth. *United States v. Zimmer,* 14 F.3d 286, 288 (6th Cir.1994).

■ In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that a search based on a warrant that contains deliberately or recklessly false allegations is invalid unless the remaining portions of the affidavit provide probable cause. Thus, a court considering whether to suppress evidence based on an allegation that the underlying affidavit contained false statements must apply a two-part test: (1) whether the defendant has proven by a preponderance of the evidence that the affidavit contains deliberately or recklessly false statements and (2) whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant. *Id.; United States v. Bonds,* 12 F.3d 540, 568–69 (6th Cir.1993).

The district court ordered a hearing to consider Charles's allegations. In order to fulfill his obligation under the first prong of the *Franks* test, Charles outlined several of the affidavit's errors. First, Charles claimed that the affidavit implied that the government had at least three informants, when in fact Bell was the government's only informant. Charles also noted that the affidavit included an incorrect telephone number, alleged to be the number that Charles had threatened to use to trace one of Slade's calls. Moreover, Charles asserted that Slade offered inconsistent physical descriptions of Charles. Finally, Charles observed that the affidavit failed to mention Slade's several unsuccessful attempts to coordinate drug deals with Charles.

Although the district court noted that the affidavit suffered from poor draftsmanship, the court concluded that the alleged false statements resulted from careless errors rather than from a deliberate or reckless

disregard for the truth. The court also concluded that the telephone number, provided by Slade in his affidavit, was indeed incorrect; however, *no evidence was offered "to support any conclusion other than that this mistake was an unintentional error."*

In his opinion, the district court judge did not address Charles's claim that the affidavit contained conflicting physical descriptions of him. Charles observed that at different instances throughout the affidavit, he was described as being bald, having a flat-top hair cut, and having a short round hair cut. The government explains that these discrepancies resulted from Charles's change of hairstyles. During a colloquy with Charles's counsel, the judge rejected the argument that the affidavit should fail as a result of different hairstyle descriptions.

Finally, Charles contends that the affidavit's omissions of the failed drug transactions made the affidavit false. Although under some circumstances a material omission may invalidate an otherwise valid search warrant, we find that Slade's omission was not material in this case. *See Bonds,* 12 F.3d at 568. Pursuant to *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the affidavit provided sufficient evidence to constitute probable cause when considering the totality of the circumstances. *Id.* at 230, 103 S.Ct. at 2328.

After a careful consideration of the search warrant issues raised by Charles in his appeal, we conclude that the district court properly denied Charles's motions to suppress. There is no evidence that the district court's decision on these issues was erroneous. In fact, the record indicates that the district court judge erred on the side of caution by granting the defendant a *Franks* hearing. The record further indicates that the district court judge was thorough in his investigation and thoughtful in his opinion. The district court's conclusion that the errors in the affidavit resulted from poor draftsmanship rather than from a deliberate or reckless disregard for the truth was based on the evidence introduced during the hearing and cannot be characterized as erroneous. Because Charles failed to prove that the affidavit supporting the warrants contained deliberately or recklessly false statements, this court does not need to consider whether, absent the errors, the affidavit would still have provided the requisite probable cause to support the warrants. *United States v. Zimmer,* 14 F.3d 286, 288 (6th Cir.1994).

Accordingly we affirm the district court's denial of Charles's suppression motions.

## C. Suppression of the Pager

Charles next claims that the district court should have suppressed the pager that the police confiscated from the white Buick during his arrest. He alleges that the police had neither probable cause nor a warrant to seize the pager. Charles was driving the white Buick when the marshals arrested him on December 22, 1995. The pager was the only item seized by the police during the arrest.

The Supreme Court in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), established "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of the arrest, search the passenger compartment of that automobile." *Id.* at 460, 101 S.Ct. at 2864. At the time of the arrest, Charles was driving the white Buick and the pager was located near the passenger seat. Thus, the district court correctly admitted the pager into evidence.

## D. Suppression of the Cellular Phone

Charles also claims that the district court erred by not suppressing the cellular phone found in the blue Buick station wagon parked outside of 862 Parham. Although Charles contends that the police found additional items in the car, the evidence at the suppression hearing supports the district court's conclusion that the police seized only the cellular phone from the station wagon. In addition, the government did not introduce the cellular phone into evidence. Charles correctly contends that the government failed to obtain a warrant for the station wagon and that the remedy for an unlawful search is suppression of the evidence. Because the government never introduced

the phone into evidence during trial, however, suppressing the cellular phone was unnecessary. Thus we agree with the district court that the failure to suppress the phone did not harm Charles.

## E. Sufficiency of the Evidence

■ Charles challenges the jury verdict finding him guilty of possession of cocaine with the intent to sell on December 15, 1995 (Count 7). Charles claims that he was attempting to steal the $1,200 from Slade on that date rather than purchase and sell cocaine base. In support of his claim, Charles points out that the police never found any drugs on his person, in his car, or at 862 Parham on December 15, 1995. He also contends that Slade's multiple failed attempts to organize a drug transaction bolster his argument that he only agreed to sell the drugs in order to abscond with Slade's money. The government responds with evidence that Charles, after spotting the surveillance vehicle on the way back from Nashville, handed the drugs to his companions before the police arrested him.

■ When reviewing a defendant's claim that a jury verdict is not supported by the evidence, "the relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir.1993) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). If the evidence "is such that a rational fact finder must conclude that a reasonable doubt is raised, this court is obligated" to grant an acquittal motion. *Id.* In order to appeal a jury's verdict based on the sufficiency of the evidence presented during trial, the defendant must make a motion in the district court for a judgment of acquittal under Rule 29 of the Federal Rule of Criminal Procedure. The Sixth Circuit has held that failure to make this motion "constitutes a waiver of any objection to the sufficiency of the evidence." *United States v. Nesbitt*, 90 F.3d 164 (6th Cir.1996). We concluded that if a defendant fails to move for a judgment of acquittal in

the district court, this court "will not reverse absent a miscarriage of justice." *Id.* We also have held that "circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994) (internal quotation marks and citations omitted).

■ In the instant case, Charles failed to move for an acquittal pursuant to Rule 29 at the close of the government's case. We may therefore disturb the jury's verdict only if it constituted a miscarriage of justice. To sustain the charge of possession with intent to distribute, the government was required to prove beyond a reasonable doubt that on December 15, 1995 Charles "(1) knowingly; (2) possessed a controlled substance; (3) with intent to distribute." *United States v. Peters*, 15 F.3d 540, 543 (6th Cir.1994). Moreover, there is a "strong presumption in favor of sustaining a jury conviction." *Id.*

Considering the totality of the evidence, it appears that the government offered enough circumstantial evidence to sustain the jury conviction in this case. Slade participated in the November 22, 1995 drug transaction and positively identified Charles as the seller. This earlier transaction provided evidence that Charles had access to cocaine base. There is no reason to doubt that Charles could have obtained more cocaine base in order to fulfill his obligation to Slade on December 15, 1995. Charles also admitted to possessing the drugs on several occasions. Charles offers no reasons to doubt the genuineness of his own assertions. Charles was not an innocent passerby who stumbled across a drug transaction. *See Peters*, 15 F.3d at 544 (holding that merely being present when a search warrant is executed is not enough to convict a party of possession with intent to distribute and stating that reversal would have been less likely if the government had offered evidence of prior drug transactions). Moreover, the message on the pager warning Charles that he was under surveillance supports the government's argument that Charles disposed of the drugs prior to his arrest. All of these factors lead us to

conclude that no miscarriage of justice has occurred. Accordingly, after a careful consideration of the record, we affirm the jury's verdict finding Charles guilty of possession with intent to distribute cocaine base on December 15, 1997.

## F. The Sentence Enhancement for Obstruction of Justice

### 1. Perjury

■ Charles contends that he neither committed perjury by denying his participation in the November 22, 1995 drug transaction nor obstructed justice by claiming to be "Charles Owen" to the magistrate judge. The district court enhanced Charles's sentence by two levels after finding that Charles obstructed justice by both committing perjury and providing a false pseudonym at the pre-trial release hearing. Proof of either offense alone would warrant a two-level enhancement. Section 3C1.1 of the United States Sentencing Guidelines provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing, of the instant offense, increase the offense level by 2 levels.

According to the guidelines, obstruction of justice includes the commission of perjury as well as the act of "providing materially false information to a judge or magistrate." U.S.S.G. § 3C1.1 application note 3(d), (f). In *United States v. Sanchez,* 928 F.2d 1450, 1458 (6th Cir.1991), the Sixth Circuit noted, "[t]he question as to whether defendants' conduct constitutes obstruction of justice, 'turns primarily on the legal interpretation of a guideline term' and is thus reviewed de novo." *Id.* (quoting *United States v. Stroud,* 893 F.2d 504, 507 (2d Cir.1990)). This court is also required "to give due deference to the district court's application of the guidelines to the facts." *United States v. Peters,* 15 F.3d 540, 546 (6th Cir.1994) (quoting 18 U.S.C. § 3741(e)).

On the issue of perjury, the district court found that Charles had lied by submitting an affidavit stating that he did not participate in the drug transaction on November 22, 1995 and testifying during the suppression hearing that he traveled to Mississippi in his blue Buick station wagon on November 22, 1995. First, the court considered Charles's sworn proffer statement conditionally given after his arrest that he participated in the drug transaction on November 22, 1995 at 862 Parham. The court also credited Agent Slade's recollection that he saw the station wagon parked outside of 862 Parham during the drug transaction that same afternoon. Slade bolstered his testimony by introducing the notebook in which, after leaving the drug transaction on November 22, 1995, he copied the license plate number of the station wagon. He later traced the plates to Charles. The district court also relied on Bell's and Slade's positive identification of Charles as the party who sold drugs at 862 Parham on November 22, 1995. In addition, the district court considered bank records showing that, on the afternoon of November 22, 1995, shortly after Slade paid Charles $1,200 for the drugs, Charles opened a bank account in Clarksville with $1,000 in cash. Considering all of this evidence, the district court found that Charles was in Clarksville on November 22, 1995 and was involved in the drug transaction at 862 Parham on that same day. Relying on these factual findings, the district court concluded that Charles had committed perjury. Accordingly, the court enhanced Charles's sentence by two levels.

Because the district court's factual conclusions are firmly based on evidence introduced at both the trial and the suppression hearing, we affirm these factual conclusions. Moreover, we conclude that the district court correctly applied the law as provided by the sentencing guidelines in adding a two-level sentence enhancement for perjury.

### 2. False Identification

■ On the issue of obstruction of justice through the use of a false identification, the district court concluded that Charles "deliberately misled a judicial officer by giving false identification to the magistrate/judge and thereby concealed his prior criminal record." Charles claims that requiring him to reveal his true identity to the

magistrate would have violated his Fifth Amendment rights.

Other courts have concluded that the use of a false identification during proceedings before a magistrate judge constitutes obstruction of justice. The First, Second, and Eighth Circuits have held that "the defendant's use of a false identity in the hope of being released on bail is an obstruction of justice ... because the grant or denial of bail is part of the process." *United States v. Thomas*, 86 F.3d 263, 264 (1st Cir.1996); *see United States v. Mafanya*, 24 F.3d 412, 414 (2d Cir.1994); *United States v. Yerks*, 918 F.2d 1371, 1375 (8th Cir.1990). Charles does not dispute that he used the name "Charles Owen" throughout the entire pre-trial release hearing. Charles further admits that he intentionally misled the magistrate judge in order to hide his true criminal record and thus secure pre-trial release.

■■■ Charles contends, however, that if he had revealed his true identity, the magistrate judge would not have granted pre-trial release. He concludes that, under these circumstances, his use of a false identification is protected by the Fifth Amendment right against self-incrimination. Charles overlooks well-settled constitutional law stating that the Fifth Amendment "grants a privilege to remain silent without risking contempt, but it 'does not endow the person who testifies with a license to commit perjury.'" *United States v. Wong*, 431 U.S. 174, 178, 97 S.Ct. 1823, 1825–26, 52 L.Ed.2d 231 (1977) (quoting *Glickstein v. United States*, 222 U.S. 139, 142, 32 S.Ct. 71, 73, 56 L.Ed. 128 (1911)). Charles could have remained silent. Once he chose to speak and affirmatively deceive the court, however, the Fifth Amendment no longer shielded him from a charge of obstruction of justice.

We concur with the district judge's conclusion that Charles used a false identification in order to deceive the magistrate judge and receive pre-trial release, and that this behavior constitutes obstruction of justice as defined by the sentencing guidelines. Thus the district court's two-level sentence enhancement would have been justified on either one of the two obstruction of justice grounds.

## G. Sentencing

■■■ Charles argues that the district court incorrectly calculated the amount of drugs at issue and therefore sentenced Charles to the wrong level in imposing a 420 month sentence. The Sixth Circuit has determined that "[f]indings of fact relating to sentencing, including the quantity of drugs attributed to a defendant, are reviewed by this court under a clearly erroneous standard." *United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir.1996).

■■■ In *United States v. Sanchez*, 928 F.2d 1450 (6th Cir.1991), we held that the fact that the evidence supporting a judge's determination of the quantity of drugs involved was "testimonial and not physical is irrelevant." *Id.* at 1460. Moreover, this court also noted that "a sentencing judge may consider relevant information which is prohibited from being introduced into evidence at trial in determining a defendant's sentence." *Id.* The government "has the burden of proving by a preponderance of the evidence the amount of drugs for which a defendant is accountable." *United States v. Mahaffey*, 53 F.3d 128, 131–32 (6th Cir.1995). In *Mahaffey*, this court considered the application of the guidelines when no drugs were physically seized. *Id.* We held that "[w]here as in this case, no drugs are seized, the sentencing court must approximate the quantity to be charged to a defendant." *Id.* Addressing the same issue, U.S.S.G. § 2D1.1, application note 12, states:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.

When the quantity of drugs is uncertain, however, the district court should exercise caution in calculating the base amount. *Mahaffey*, 53 F.3d at 131–32. It should also be noted that "[a] court's approximation of the amount of drugs involved in a particular case is not clearly erroneous if supported by 'competent evidence in the record.'" *Id.* at 132 (quoting *United States v. Brannon*, 7 F.3d 516, 520 (6th Cir.1993)).

The district court found that Charles was responsible for the sale of drugs ranging

from 152 grams to 243 grams. This figure was based on testimony from Bell, the amount of drugs that Slade saw on November 22, 1995, and the amount of drugs bargained for on December 15, 1995. Slade testified that he saw forty grams on November 22, 1995 and that the bargain on December 15, 1995 was for 56 grams. Furthermore, the court credited Bell's testimony that throughout their association Charles was responsible for between four and five ounces of cocaine. Although Bell testified that during that time he used suppliers other than Charles, the judge believed Bell's additional testimony that Charles was Bell's main supplier of cocaine. Thus the court attributed between 56 and 147 grams to Charles's previous dealings with Bell.

The government properly observed that even if the court accepted Charles's claim that he only possessed between 74.69 grams and 133.69 grams, the sentence of 420 months would fit within the applicable guideline range. Because the maximum sentence under 21 U.S.C. § 841(b)(1)(A) for possession of 50 grams of cocaine base is life imprisonment, the sentencing guidelines pursuant to § 4B1.1 require that the offense level be set at a minimum of 37 for all qualifying career offenders. Under the sentencing guidelines, the sentence for offense level 37 and a Criminal History Category of VI ranges from 360 months to life. Accordingly, the government needed only to prove that Charles possessed 50 grams of cocaine base and qualified as a career criminal in order to justify the district court's sentence of 420 months. A defendant qualifies as a career offender pursuant to U.S.S.G. § 4B1.1 if:

> (1) the defendant was at least eighteen years old at the time of the instant action, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

The district court found that Charles met all three criteria and qualified as a career offender as a result of his multiple prior felony convictions. Because the sentence range would be identical even if this court adopted

Charles's assertions on the proper amount of drugs he sold, any calculation errors on the part of the district judge would constitute harmless error. Accordingly, we affirm the district court's imposition of sentence under the guidelines.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court and uphold the jury's verdict.